IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MANUEL HIERRO,

      Plaintiff,

v.                                CASE NO. 5:09-cv-00068-RS-AK

DR DANIEL CHERRY, et al,

      Defendants.

_____/

**O R D E R**

Plaintiff brings this cause of action pursuant to 42 U.S.C. §1983 alleging that Defendants

were deliberately indifferent to his serious medical needs[1]. Defendants Dr. Cherry and Advanced

Registered Nurse Practitioner (ARNP) Celeste Macdonald[2] have filed for summary judgment

(doc. 46), and Plaintiff has responded. (Doc. 64).

**I.      Allegations of the Complaint (doc.1)**

Plaintiff claims that prior to his incarceration he had been diagnosed with HIV and had

triple bypass heart surgery and four herniated discs for which he was being treated successfully.

When he arrived at Orange County Jail in May 2007, he alleges that Dr. Jane Doe refused to

provide him the costly medications he had been taking and refused to treat him causing a de-

stabilization of his HIV and heart conditions and severe pain. Upon his transfer to DOC in June

2007, he alleges that Dr. Can Tran failed to prescribe him any medication and did not order his

---

[1] Defendant Lamanglob has been dismissed based on Plaintiff's assertion that he was
wrongly named (docs. 50 and 53) and Dr. Can Tran is being served in his place. The Court has
been unable to serve Dr. Jane Doe, whom Plaintiff has identified as Dr. Sandra Hodges.

[2] Defendant's name is spelled differently as McDonald, MacDonald, and Macdonald.

examination by specialists and he was untreated for 60 days until his transfer to Holmes CI.  He

alleges that he suffered a heart attack 24 hours after he arrived at Holmes CI.  After his release

from intensive care, he was transferred to Apalachee CI where he alleges that Dr. Daniel Cherry

failed to examine him even though he had just spent 4 days in ICU.  Nurse Celeste Macdonald

examined him, but did not refer him to Dr. Cherry.  An x-ray was taken of his back, and

Macdonald gave him ibuprofen, nitroglycerin, and issued several medical passes for no

prolonged standing over 20 minutes, no lifting over 15 pounds, and no sports activity.

Nonetheless, Plaintiff was assigned a job requiring standing 8 hours a day and lifting heavy pots

and pans.    When he complained, he was told that he had no medical passes.  He asked

Defendant Macdonald to help, but she allegedly did nothing and refused to refer him to Dr.

Cherry.  She did change his medication to a nitro patch and added Elavil for his back.

He was transferred to Apalachee West Unit, a work camp, where he was assigned to mow

the grounds which caused severe pain and fatigue.  A nurse, Harold Parker, examined him and

recommended that he be seen by a cardiologist, Dr. Benjamin Olliff, who found after testing that

he had lost 35% of function.  Upon his return to Apalachee West Unit, Plaintiff claims that he

still received no treatment, and when he returned to see Dr. Olliff six weeks later tests revealed

two recent, additional heart attacks and a decrease of 50% normal function.  Finally, after 17

months from his heart attack in July 2007, he began heart medication.  His T-cell count was also

significantly diminished indicating that his HIV had also progressed because of lack of treatment.

A)	Job Program Assignment dated 11/13/07 (Exhibit A)

Shows a request for a job change from unassigned to "61/E004 F/S and 61/F004 F/S"

with no medical reasons shown.  An Inmate Request dated August 13, 2007, also marked Exhibit

A, asks why he is working food service and the response is "Because Medical does not have you on any restrictions."

B)      Medical Passes (Exhibit B)

Health Pass from 9/13/07 to 9/13/08[3] signed by Defendant Celeste Macdonald shows low bunk, no shave, and no prolonged standing over 20 minutes, no weights, no lifting over 15 pounds, and no sports, and one signed by Harold Parker from 9/25/08 to 9/25/09 for low bunk, no shave, and no prolonged standing over 30 minutes, no lifting (and the rest is illegible).  One pass from 7/14/08 to 8/14/08 precludes lifting, pushing, pulling over 25 pounds, and the other pass is illegible.  Another pass from 8/10/07 to 8/10/08 is for an ankle support.

Also shown is a prescription dated November 18, 2008, for a Nitroglycerin patch to be applied daily.

C)      Letter to Attorney David Lee Sellers dated August 2, 2007 (Exhibit C)

Plaintiff asked Sellers for help getting medical treatment and he told him to file a complaint with the Director of Health Services and forwarded Plaintiff's letter to the Governor.

D)      Response from DOC to Plaintiff dated August 15, 2007 (Exhibit D)

Ebony Harvey at FDOC  forwarded Plaintiff's letter that had been forwarded to Governor Crist to the Office of Health Services.

E)      Letter from Impaired Inmate Coordinator dated October 10, 2007 (Exhibit E)

Plaintiff's medical situation was investigated and it was found that he was being followed in the Immunity and Cardiovascular Chronic Clinic and had been started on anti-retro viral

---

[3]  The Health Passes did not photocopy well and the ending year is not clear, but it is more likely that the pass ran for one year rather than one day.

therapy on July 26, 2007. He was encouraged to use sick call to resolve problems at the institutional level and the response was copied to Dr. Daniel Cherry, Chief Health Officer.

      F)      <u>Inmate Requests (Exhibit F)</u>

On August 31, 2007 Plaintiff complained of chest and back pain and requested to see an HIV specialist. The response was to use sick call to address these issues and he had a clinic appointment scheduled in October.

Another Inmate Request dated September 3, 2007, complained of continued pain and lack of care. The response dated September 11, 2007, was that he was seen on September 5, 2007, x-rays were ordered, and he would have a follow up with Macdonald when the results were received.

Inmate Request dated September 16, 2007, said he was having problems with Elavil and wanted different medication. The response was to use sick call.

On September 18, 2007, he wrote that the he did not want to take Elavil because it was an antidepressant. The response was to sign a refusal at the medication window.

Inmate Request dated June 22, 2005, asks what is wrong with his heart. The response is that he will be seen soon.

      G)      <u>Administrative Appeal (exhibit G)</u>

Administrative Appeal dated April 4, 2008, states nothing is being done to help him at Butler Medical Camp, which he describes as a "torture camp." The response was that he must file a formal grievance first.

      H)      <u>Formal Grievance dated December 2, 2008 (exhibit H)</u>

Addressed to the Warden at Apalachee CI West, he complains that he has had three heart

attacks and nothing is being done and he has not been provided with his medical records, as requested. The response is that he has seen a specialist at RMC and if he still has issues he should use the sick call system. There was no record of a request for his file, he should make another one.

His appeal of this decision was made to the Secretary on December 22, 2008, and an investigation of his claims revealed that Dr. Cherry responded to him on December 16, 2008, and appropriately addressed his issues.

[the remaining attachments are duplicates of the previous exhibits]

## II.    Standard of Review

A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." Nolen v. Boca Raton Community Hospital, Inc., 373 F.3d 1151, 1154 (11th Cir. 2004), *citing* Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986). All issues of material fact should be resolved in favor of the Plaintiff or non-moving party before the Court determines the legal question of whether the defendant is entitled to judgment as a matter of law under that version of the facts. Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003); Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). The Plaintiff has the burden to come forward with evidentiary material demonstrating a genuine issue of fact for trial. Celotex, 477 U.S. at 322-23. Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. There must be such evidence that a jury could reasonably return a verdict for the

party bearing the burden of proof.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986).  "For factual issues to be considered genuine, they must have a real basis in the record."  <u>Mize v. Jefferson City Board of Education</u>, 93 F.3d 739, 742 (11th Cir. 1996).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  <u>Owen v. Wille</u>, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  <u>Owen v. Wille</u>, 117 F.3d at 1236; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

While a moving party is not required to support his motion for summary judgment with affidavits, <u>Celotex,</u> <u>supra</u> at 323, the facts stated in uncontradicted affidavits or other evidentiary materials must be accepted as true for purposes of summary judgment.  <u>Gauck v. Meleski</u>, 346 F.2d 433, 436 (5th Cir. 1965).

## III.    Defendants Rule 56(e) evidence (doc. 46, exhibits A-Z2)

A)    <u>Inmate Population Detail</u>

Plaintiff is convicted of Grand Theft, his initial receipt date is 6/11/2007, and his release date is August 8, 2013.

B)    <u>Internal Movement</u>

Shows that Plaintiff was at RMC on 6/11/07 until his transfer to Holmes CI on 7/17/07.

He was then transferred to Apalachee CI on 7/24/07, where his first work assignments was as a Houseman on July 26, 2007; laborer in Food Services on August 9, 2007; Inside Grounds on October 23, 2007; and Administrative Confinement on November 1, 2007.

 C)  <u>Affidavit of Dr. Daniel Cherry with Supporting Medical Records</u>[4]

 Dr. Cherry attests that Defendant McDonald is an Advanced Registered Nurse Practitioner (ARNP) and is qualified to perform evaluations, diagnose and treat inmates, as well as make important medical decisions and provide management for a variety of chronic health care problems. Dr. Cherry avers that, as Chief Health Officer, he does not have a duty to personally evaluate each inmate and the ARNPs have supervisory authority over their daily care. He also attests that medical personnel are not responsible for work or classification assignments.

 Upon reviewing Plaintiff's medical records, Dr. Cherry found that he arrived at ACI on July 24, 2007, (exhibit B), and was evaluated the next day by Macdonald. (Exhibit C). A number of blood test were conducted and Plaintiff was begun on two HIV medications the next day, July 26, 2007. (Exhibit D). According to lab results, Plaintiff's RNA studies showed continued improvement. (Exhibits I1-I3, N-O1) and he was continued on his HIV medications. (Exhibits S2, T1, W4, X3 and Z2).

 Likewise, Dr. Cherry reports that the medical record shows that Plaintiff's heart condition was noted at his evaluation on July 25, 2007, (exhibit C), and an EKG was ordered. The results "indicated a contour abnormality consistent with an inferior infarction which was probably old." Cherry Affidavit at ¶15, exhibits F1-F3). On January 3, 2008, a cardiac consultation and a repeat

---

 [4] Dr. Cherry has reviewed Plaintiff's medical records, which are extensive, and summarized his treatment referencing the records. The Court will use this format as well and will not separately summarize the attached records.

EKG was requested. (Exhibit P). Plaintiff was transferred on January 31, 2008, to RMC for the consultation. (Exhibit R2). Dr. Olliff at RMC found that the EKG established an old inferior infarction and he started him on a plan with medication adjustments and scheduled him for a stress test. (Exhibits T1 and T2). Plaintiff returned to ACI on May 8, 2008 and was seen immediately for cardiac follow up. (Exhibits V1 and W1). Additional labs were drawn and another EKG scheduled. (Exhibits W2 and W3). Dr. Olliff's treatment plan was implemented (Exhibit W4) and he was kept off strenuous activity for 4 weeks. (Exhibit W4). He was returned to RMC on June 26, 2008, and the results of his stress test reviewed with him. (Exhibit V1). He was returned to ACI on July 10, 2008, and seen for follow up on July 14, 2008, where adjustments were made to his medication regimen and passes issued for no lifting, pushing, or pulling over 25 lbs with his left arm. (Exhibit X1). Plaintiff was seen on September 5, 2008, when labs were drawn again, and passes were issued for low bunk, no shaving, no prolonged standing over 10 minutes, no lifting, pushing, or pulling over 25 pounds. A repeat EKG was done at RMC on October 6, 2008, with abnormalities noted and Plaintiff was returned to ACI on October 16, 2008. (Exhibit Y and V2). On October 30, 2008, and November 28, 2008, Plaintiff was seen to discuss the consultation results from RMC and his condition was deemed stable. (Exhibit V2, Y2 and Y3). On January 16, 2009, labs were drawn, a treatment plan was noted, and canteen reports obtained that showed Plaintiff was not eating according to recommendations (multiple purchases of junk food). (Exhibits Z1 and Z2).

With regard to passes, Dr. Cherry noted that Plaintiff requested a pass for no prolonged standing on August 23, 2007, which was denied because there was "no visible need" for it at that time. (Exhibit H). On September 5, 2007, Plaintiff complained of lower back pain, an x-ray was

ordered, and it revealed moderately severe disc disease, and on September 13, 2007, passes were issued for no prolonged standing over 20 minutes, no lifting over 15 lbs, no sports, no shaving, and a low bunk pass. (Exhibit M). On July 14, 2008, adjustments were made to his medication regimen and passes issued for no lifting, pushing, pulling over 25 lbs with his left arm. (Exhibit X1). Plaintiff was seen on September 5, 2008, and passes were issued for low bunk, no shaving, no prolonged standing over 10 minutes, no lifting, pushing, or pulling over 25 pounds. (Exhibit W1).

With regard to medications, it was noted on evaluation that Plaintiff was taking Plavix, Atenolol, and nitroglycerin patches and tablets. (Exhibit C). At an evaluation on October 16, 2007, Plaintiff reported that he was taking EC ASA, Folic Acid, Elavil, Nitro transdermal, Truvada (HIV medication), Kaletra (HIV medication), Bactim, Atenolol, Zmax, and Plavix. (Exhibit P). On January 30, 2008, during an evaluation for a cardiac consultation when a repeat EKG was requested, refills were ordered on Plavix and Atenolol.

D)    Affidavit of Celeste McDonald (exhibit C2)[5]

McDonald attests that Plaintiff's HIV medications, as prescribed on July 26, 2007, were continued as long as he was at ACI through the date the complaint was filed. She, too, describes the multiple examinations, lab tests, EKGs, and medications she ordered to treat his heart condition. She was transferred to Jefferson Correctional Institution in March 2008, but recites the medical history of treatment received at ACI after she left.

---

[5] Only non-cumulative information contained in this affidavit will be summarized in this section.

**IV.     Plaintiff's Response (doc. 64)**

Plaintiff claims that material facts are in dispute, thereby precluding summary judgment: specifically, (1) whether Macdonald had a duty to refer him to Dr. Cherry because of his serious health needs; (2) whether Cherry had a duty to personally examine him; and (3) whether Defendants failed to follow the instructions of the specialist they sent him to see, Dr. Olliff.

A)     <u>Affidavit of Manuel Hierro</u>

Plaintiff attests that he complained about his back, but received no treatment or examination until 9/5/2007.

Plaintiff attests that he was forced to work as a laborer until he finally received a pass on 9/10/2007, and he was still forced to work beyond his means after that.

Plaintiff attests that he never saw Dr. Cherry, even though he requested to see him.

Plaintiff attests that he was never given Crestor as prescribed by Dr. Olliff.

Plaintiff attests that his chest pain has worsened and his LVEF has decreased because he did not receive Crestor.

(B)     <u>Answers of Defendant Macdonald's to Plaintiff's Interrogatories (exhibit 1)</u>

Macdonald attests that she is authorized to prescribe medications except Schedule I or II. She denied his pass request on 8/23/07 because there was no visible need to restrict him from prolonged standing, but on September 13, 2007, she gave him multiple passes after an x-ray confirmed lumbar issues.

C)     <u>Defendant Cherry's responses to request for admissions (exhibit 2)</u>

Cherry admits that he never personally examined Plaintiff, but he did review his records. He admits that when Plaintiff arrived at ACI he had been taken to the emergency room for chest

pains on July19, 2007.

D)  Defendant Cherry's responses to interrogatories (exhibit 3)

Cherry responds that his duties regarding Plaintiff's medical care was "oversight" of all the inmates at ACI.  He does not stamp each page of the medical record he reviews.  Plaintiff was prescribed Elavil for neuropathic pain associated with HIV.  Doctor's Clinic does not mean that everyone there is a doctor, and ARNP's are not physicians.

E)  Medical Records (exhibits 4 - 5)

Several entries indicate that Dr. Andem, CHO at Holmes CI, examined and made treatment note entries before Plaintiff was transferred to ACI.

F)  Defendant Macdonald's Answers to Request for Admissions (exhibit 6)

Macdonald admits that she denied him a pass on 8/23/07 and admits that he had complained of low back pain and that this condition was noted on intake.  She admits that despite this information, she did not issue him a work activity restriction pass at that time or upon subsequent examination on 9/5/07.

G)  Consultant's Report dated 2/7/08 (exhibit 7)

Notes that Plaintiff had a triple bypass in November 2004 with 3 grafts and was having chest pain upon exertion. He states "Remarkably, he is not on a statin, which is the only effective long-term treatment of coronary artery disease."  It was noted that Plaintiff should start Crestor 20 mg, have a fasting lipid and liver profile done in 8 weeks, and schedule a stress test.  EKG showed abnormalities and evidence of an old infarction.

H)  Consultant's Report dated 4/17/2008 (exhibits 8-9)

.  Stress test showed moderate defects and LVEF of 34%.

I)      Consultant's Report dated 10/06/08 (exhibit 10, 12)

Shows left atrial enlargement and ejection fraction estimated around 50%.  Note states: "I don't know why he was switched from Crestor to Mevacor and this [decreased]...."

J)      Treatment Noted dated 9/25/08 (exhibit 11)

Current medications are: Mevacor, Naprosyn, Kaletra, Truvadia, and Atenolol.

K)      Treatment Noted dated 1/20/09 (exhibit 13)

Current medications are: Plavix, Elavil, NTG patch, Kaetra, Truvadia, ASA.

L)      Consultant's Report dated 3/14/08 (exhibit 14)

Dr. Olliff notes that a "Lopid 600 was ordered, but IM says he is not on it."

M)      Treatment Note dated 9/14/09 (exhibit 15)

Shows Lopid 600 as a current medication.

N)      Consultation Request dated 1/17/08 (exhibit 17)

Shows Plaintiff complaining of angina upon exertion.  Medications are: NTG patch, ASA, Elavil, Truvadia, Kaletra, Atenolol, Bactrim, Zithromax, and Plavix.

O)      Consultation rEquest dated 5/8/08 (exhibit 16)

Shows that follow up was needed with Olliff after stress test on 4/17/08.

P)      Request for Prior Approval dated 8/13/08 (exhibit 16)

Signed by Dr. Cherry for EKG.

**V.      Analysis**

Deliberate indifference to the serious medical needs of prisoners violates the Eighth Amendment's prohibition of cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The concept of deliberate indifference must be more than

negligence, but is satisfied by something less than actions undertaken with an intent to cause harm.  Farmer v. Brennan, 511 U.S. 1216, 114 S. Ct. 1970, 1978, 128 L. Ed. 2d 811 (1994).

Subjective recklessness, as defined in criminal law, is the standard which must be shown for an official's actions to rise to the level of deliberate indifference.  *Id*.  Combining the standards from Farmer and Estelle, the Eleventh Circuit has recently clarified that, ultimately, there are four requirements to bringing an Eighth Amendment claim for the denial of medical care:  an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000).

A purely medical judgment "that in hindsight...may have been poor or even that it may have constituted negligence or medical malpractice does not elevate Plaintiff's claim to a tort of constitutional dimensions."  Pate v. Peel, 256 F. Supp.2d 1326, 1327 (N.D. Fla. 2003), citing Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (differences in opinion between medical staff and inmate do not state Eighth Amendment claim).

A)      HIV

Plaintiff claims that he received none of his HIV medications after he arrived at ACI and was examined by Defendant Macdonald.  The overwhelming evidence, as established by his medical record, is that he was begun on two different HIV medications within two days of arriving at ACI, and there is no evidence that this medication was interrupted.  Every medical entry where his current medications were listed included Kaletra and Truvada, which Dr. Cherry explained are used to treat adults with HIV-1 infection.  Dr. Cherry and ARNP Macdonald both attest in their sworn affidavits that his HIV condition improved according to lab results.

Plaintiff does not address this medical evidence or offer counter evidence regarding his HIV treatment in response to these representations. In his affidavit, Plaintiff argues only about his back pain being untreated and about his being denied Crestor after the cardiologist ordered it. Plaintiff must go beyond the pleadings in responding to a motion for summary judgment, either by his own affidavit or by other evidentiary materials to show that there is a genuine issue for trial. Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)). Plaintiff has provided nothing to support his claim that he was not treated for HIV and his condition worsened. All the medical evidence shows that his condition was stable and he continued on the medication prescribed to treat HIV from his arrival at ACI through the date of the complaint. Defendants are entitled to summary judgment on this claim.

B)      Heart condition

Resolution of this issue has been complicated by Plaintiff's gross exaggerations of the facts. For example, Plaintiff claims that within 24 hours of arriving at Holmes CI (on July 17, 2007) he had a severe heart attack. (Doc. 1, ¶5). During testing by Dr. Olliff, Plaintiff represents that it was discovered that he had suffered two additional heart attacks since he arrived at Apalachee CI. (Doc. 1, ¶12). There is absolutely no medical evidence that Plaintiff suffered any heart attacks while in the custody of the Florida Department of Corrections. On intake at the Chronic Illness Clinic on July 25, 2007, his ASCVD is listed as "stable," and there is no mention of a severe heart attack that Plaintiff claims occurred less than ten days prior. In fact, the testing conducted by Dr. Olliff (an EKG) showed an "old inferior infarction," and in his report on February 7, 2008, Dr. Olliff writes in summarizing his medical history that Plaintiff had three

coronary bypass grafts in November 2004, prior to his incarceration. There is no mention of any heart attacks, recent or otherwise.

Plaintiff adds that "it was not until after seventeen months after Plaintiff's July 2007 (while in DOC custody) heart attack that he finally received heart medication: (Plavix, Carvedilol, Gemfibrozil & Pravastatin)." (Doc. 1, ¶13). This, too, is wholly unsupported by the record which shows that upon intake at ACI he was on a number of heart medications, which were continued throughout his medical history. (Doc. 46, Exhibit C3). In light of the sensationalism of his original claims, i.e. that he suffered 3 heart attacks in DOC and received no heart medication for 17 months, his attempt to re-characterize these attacks as "episodes" of "acute chest pain" which he believed were heart attacks is feeble. (See Doc. 64, p. 17). While Plaintiff may have caught the attention of the Court with these claims, such misrepresentation is also sanctionable, as will be discussed below.

Nonetheless, there is one issue raised by Plaintiff that is not controverted by the record and that is with regard to his receiving Crestor, a statin prescribed by Dr. Olliff. Plaintiff first saw Dr. Olliff on January 31, 2008, upon his transfer to RMC. In a report dated February 7, 2008, Dr. Olliff wrote: "He says he has been having chest pains since June when he came into prison. Remarkably, he is not on a statin, which is the only effective treatment of coronary artery disease." (Doc. 64, Exhibit 7A). In his treatment plan, Dr. Olliff states "start Crestor," and under his assessment (all of which is stamped Received by Medical Records at RMC and by Harold Parker, ARNP at Apalachee CI), he writes "He must be maintained on treatment with statins to lower his LDL to 70 unless he cannot take them." (Doc. 64, Exhibit 7C). On May 28, 2008, at ACI Chronic Illness Clinic his Current Medications lists Crestor 20 mg. (Doc. 46, W4).

On July 11, 2008, Dr. Olliff writes "Lipids not good, ? If taking his statin Crestor." On

September 25, 2008, under his Current Medications listed at the Chronic Illness Clinic at ACI,

Crestor is not listed. (Doc. 64, Exhibit 11). Back at RMC, Dr. Olliff writes in a report dated

November 4, 2008, that "I don't know why he was switched from Crestor [to] Mevacor and this

was decreased to Mevacor 20 mg." (Doc. 64, Exhibit 12). He writes "[Discontinue] Mevacor

and start Prevachol 40 mg." (Exhibit 12). Back at ACI on January 2, 2009, at the Chronic

Illness Clinic, Plaintiff was noted to be taking Prevachol 40 mg.

     To put this in historical perspective, Plaintiff was not prescribed Crestor until February 7,

2008. (Doc. 64, Exhibits 7A-7C). Defendant Macdonald left ACI in March 2008. (Doc. 46,

Exhibit C2). Plaintiff remained at RMC until he was transferred back to ACI on May 8, 2008.

(Doc. 46, Exhibit V1). On May 28, 2008, he was taking Crestor as prescribed. (Doc. 46, Exhibit

W4). He was transferred back to RMC on June 26, 2008, and returned to ACI on July 10, 2008,

(doc. 46, exhibit V1), at which time Dr. Olliff questioned whether he was taking Crestor as

prescribed because his lipid profile was not good. (Doc. 46, Exhibit 9). Upon his return to ACI,

the treatment plan on July 14, 2008, as reflected by ARNP Harold Parker's treatment note and

summarized by Dr. Cherry in his affidavit was: "Discontinue Clinoril; Naprosyn 500 mg BID x3

months; Echo pending; Chart Review in 2 weeks > echo. No lifting, pushing or pulling > 25 lbs

with left arm. (Doc. 46, Cherry Affidavit, ¶29, Exhibit X1). **Crestor was not included as part

of the treatment plan once Plaintiff arrived at ACI despite Dr. Olliff's notes.** The next

documentation of Plaintiff's medications are on September 25, 2008, at ACI when it shows

Mevacor, a statin, to be part of his treatment regimen.

     Dr. Olliff wrote on November 4, 2008, that "Crestor was stopped [and switched] to

Mevacor 60 9/15/08 ?Why? Then Mevacor [decreased] to 20 mg 10/28/08 ?Why?" (Doc. 64, Exhibit 12).

Dr. Cherry does not address this in his affidavit and the attached medical records do not explain who, when or why this switch was made. However, Defendant Macdonald was no longer at ACI at this time and she cannot be held liable for any medical decisions concerning Plaintiff after March 2008. Dr. Cherry, however, attests that he reviewed Plaintiff's medical records during his tenure at ACI, and his duties as Chief Health Officer were to have "oversight" over all the inmate's care at ACI. It is Plaintiff's contention that there is a material fact in dispute whether Defendant's inaction in failing to follow Dr. Olliff's treatment plan to prescribe Crestor and/or to continue this medication resulted in a loss of heart function and was therefore deliberate indifference to his serious medical needs. Neither Defendant Cherry nor Defendant Macdonald explain whether Plaintiff's heart condition worsened over the relevant time period as he suggests in his response with attached medical records and the Court is not in a position to interpret the EKG results provided.

While the failure to follow the recommendations of an outside consultant is not necessarily indifference, if there is some showing that the failure resulted in a less effective regimen, it may be. See Morris v. Gay, 2007 WL 2917571 (S.D. Ga.) (disagreement was over type of pain medication and there was explanation from the medical staff as to why they did not follow the consultant's recommendations). In the present case, the issue over the statin prescription is in dispute and Defendants have not provided sufficient information to explain what appears to be a failure to follow the recommendations of a cardiologist who was of the opinion that a statin was the only effective treatment for Plaintiff's condition. It is also in dispute

whether the failure to prescribe a statin, or the particular statin and dosage recommended by Dr. Olliff, resulted in actual harm to Plaintiff.

Thus, on this issue, Defendant Cherry is not entitled to summary judgment. Insofar as Plaintiff asserts this claim against Defendant Macdonald, the claim is dismissed.

C)     <u>Work Assignment</u>

Plaintiff argues that he was issued passes when he first arrived at ACI and yet he was forced to work beyond these restrictions and Defendants Cherry and Macdonald did nothing to help him.

The evidence submitted by Plaintiff (doc. 1, exhibits A and B) is that he filed a grievance about his work assignment on August 13, 2007, and the response was correct that there were no medical restrictions upon him at that time. (Doc. 1, Exhibit A). The passes Plaintiff attached to his complaint begin on September 13, 2007, and were issued for one year. (Doc.1, Exhibit B). Other grievances attached to the complaint concerning his work assignment do not mention Defendants Cherry or Macdonald in the context of having ignored his request for passes or otherwise causing him to work in food services or inside grounds. (Doc. 1, Exhibit 10).

According to Defendants' affidavits and the supporting medical record history, Plaintiff requested a pass for no prolonged standing from Defendant Macdonald on August 23, 2007, which she denied because she could see no visible need to issue one. (Doc. 46, Exhibit C2, ¶15). The medical record shows that passes were issued on September 13, 2007, after x-rays were obtained showing issues with his lower back (doc. 46, exhibit C2, ¶18), which prohibited any prolonged standing over 20 minutes or lifting over 15 pounds . According to Plaintiff, he was forced after this time to continue to work on his feet all day and lift heavy pots and pans, and

then in late 2007, he was switched to inside grounds which required mowing the lawn with hand powered mowers. When he complained to Classification, he was allegedly told that his medical passes were "no good." Evidence provided by Defendants show his work assignment as Food Service from 8/9/2007 to 10/23/2007 at which time he was switched to Inside Grounds until his Administrative Confinement on 11/1/2007. (Doc. 46, Exhibit B).

If, as Plaintiff contends, he was required to perform work duties requiring prolonged standing over 20 minutes and lifting objects over 15 pounds after 9/13/2007, then he was required to work beyond his medical restrictions.

However, he has sued no classification officers nor does he name in the complaint the person whom he alleges told him his passes were no good and forced him to work contrary to his medical restrictions. As Defendant Cherry points out, medical staff are not responsible for work assignments. Plaintiff must show that the defendants knowingly permitted Plaintiff to perform physical labor that was beyond his strength, dangerous to his health, or unduly painful. Mays v. Rhodes, 255 F.3d 644, 649 (8th Cir. 2001). He claims he told Defendant Macdonald about it, but the only corresponding medical entry (and the only evidence in the record on this point) after he started food services on 8/9/2007, is on August 23, 2007, and this is when Macdonald told him she would not give him a pass. He does not claim that he talked to Macdonald after this time about working beyond his capabilities, rather he alleges that he told Harold Parker ( not a defendant) that he was unable to work and Parker ordered a consultation at the cardiology clinic (doc. 1, ¶ 11).

Thus, with regard to the allegations that Defendants Cherry and Macdonald were deliberately indifferent to his serious medical needs by forcing him or allowing him to work

beyond his medical capabilities, the evidence before the Court fails to state a claim for relief as to these two defendants.

D)     Sanctions

Florida Statute §944.279(1) provides for the following sanctions when a prisoner is found to have brought a malicious suit involving false information:

> At any time, and upon its own motion or on motion of a party, a court may conduct an inquiry into whether any action or appeal brought by a prisoner was brought in good faith. A prisoner who is found by a court to have brought a frivolous or malicious suit, action, claim, proceeding, or appeal in any court of this state or in any federal court, which is filed after June 30, 1996, or to have brought a frivolous or malicious collateral criminal proceeding, which is filed after September 30, 2004, or who knowingly or with reckless disregard for the truth brought false information or evidence before the court, is subject to disciplinary procedures pursuant to the rules of the Department of Corrections. The court shall issue a written finding and direct that a certified copy be forwarded to the appropriate institution or facility for disciplinary procedures pursuant to the rules of the department as provided in s. 944.09.

The Court finds such sanctions are appropriate here because Plaintiff made false and particularly egregious allegations of medical indifference and neglect that are clearly baseless and he persisted in pursuing his claims with the certain knowledge that the medical record would show that he did not have three heart attacks and had received his HIV and some heart medication, even if he did not receive all the medication his cardiologist recommended.

Accordingly, it is

**ORDERED:**

1.  Defendants' Motion for Summary Judgment (doc. 46) IS DENIED IN PART, insofar as Plaintiff's claim against Defendant Cherry for not adhering to the recommendation of Dr. Olliff that Plaintiff be prescribed and/or maintained on Crestor to manage his coronary artery disease.  The motion is GRANTED IN ALL OTHER RESPECTS.

2.  This order, which includes a finding that Plaintiff knowingly brought false information before the Court, shall be sent by certified copy to the Florida Department of Corrections, Office of General Counsel, 2601 Blair Stone Rd., Tallahassee, Florida 32399-2500, for appropriate disciplinary sanctions pursuant to Florida Statute §944.279(1).

**ORDERED** on May 28, 2010.


/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**